The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may draw near, give their attendance, and they shall be heard. God save the United States of America and this Honorable Court. You may be seated. The Court is in session. Please be seated. Today's cases will be called as previously announced. Sometimes it will be as a lot of a council. The first case today is number 21-1612, United States v. Jonathan Monson. At this time, would Attorney King please come to the podium and introduce himself on the record to begin? Good morning. May I please report my name is Jin Ho King, and I represent the defendant, Jonathan Monson. May I reserve one minute for rebuttal? You may. Thank you, Your Honor. We asked the Court to grant relief for three reasons. First, the evidence was insufficient to establish the interstate commerce element for the first four counts. Second, that the district court incorrectly found that the March 8th interrogation was noncustodial. And third, because the district court incorrectly calculated the appropriate guideline sentence. I'll address these arguments in turn. First is concerning the sufficiency on the interstate commerce element. There are two parts to this argument. The first part concerns just the first count. And so that is essentially a statutory construction argument. The case that's most directly on point is from the Sixth Circuit, Lively, and Lively is consistent with this circuit's precedent, essentially interpreting that the purpose at the time of the abuse- I think that that is important to refine a bit. Yes, it is appropriate to make inferences about what the defendant's intent was at the time of the abuse. But the issue in this case, as applied in this case, is that there was no evidence of intent to use that subject. That's what I'm saying is what is the kind of evidence that you need? Beyond the evidence that a person is filming it for personal use on a phone, is that not enough to at least permit the inference that that person would want to use it on other devices as some of them become expired or whatever? Because, and I guess just to make the point, isn't the position, if we said no, isn't that inconsistent with the outcome in Foley? No, I don't think that that's inconsistent. Was there evidence in Foley that he intended to make a copy? I think that the evidence in Foley was broad enough that- What was the evidence there that's different than from what's here? Well, here, I think- I guess I want to see, are we actually going to be making a decision that would be inconsistent with Foley? I think in this case, the evidence is very clear that the device on which the image was ultimately found was not even in existence at the time of the abuse. But why is that significant for the common sense inference that he would want to put it on a phone? He put it on one phone, so presumably he'd like to have access to it. If he gets a new phone, why would we think he wouldn't want to put it on the new phone that's the phone he uses? I think that would be on a case-by-case determination. Do you think it's dependent on whether the new phone happened to exist at the time he took it on the old phone? No, I think it ultimately depends still on the inferred intent at the time of the abuse. Okay, so you're saying there's nothing here beyond the fact of the initial production, right? That's right. And wasn't that true in Foley? I would have to review Foley again for that particular issue. Counsel, why doesn't the concept of production encompass more than just recording the initial image? I thought the concept of production, which we've been told we should interpret broadly, can include uploading, if that's the correct terminology, to another device. I mean, I think that's the government's position, is it not? To me, there's both a textual and a common sense basis for that argument. What's wrong with that? I actually don't think that there is anything wrong with that. The issue in this case is not whether this constitutes production. The issue is whether that actually fits within Section 2251, because the gravamen of Section 2251 is the abuse with the intent to produce. So there needs to be the concurrence of that intent along with the action of the use of the minor. So this is not a case where we're trying to say that production is anything less than what the cases say or what the statute says. This really is about what was the intent at the time of the action. But does the interstate commerce element also have to apply at the time of the use of the child or abuse of the child? Yes. Why? The key word in the statute is that. In terms of describing what the visual depiction is, the statute starts with any person who uses a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of that conduct shall be punished. And then after that comes the interstate commerce element. If that visual depiction, key word being that, if that visual depiction that was previously mentioned in statute was produced. No, I thought your position was that that visual depiction can be a copy of an initial production. That is not our position. It needs to be the same visual depiction, but the intent can be. No, I understand the intent point. I'm just saying that the way the statute reads, you're not saying that a copy of an earlier depiction can never fall within the statute. That is correct. Right. And then you're just saying that copy has to have been produced through means using interstate commerce and that the copy had to have been intended at the time of the initial production, right? Right. Which itself need not have used tools of interstate commerce to produce it. That is our position, yes. Okay. So I think your answer to Judge Howard then is that the interstate commerce need not have been involved at time one. It only has to be involved at time two in the production of a copy. So that is, I would say that it's a little more nuanced than that because it does depend on ultimately the intent. It ultimately depends on the intent. But the intent is the intent to produce, not the intent to produce by means of interstate commerce. That's right. That's right. It's the intent to produce a visual depiction of that conduct where if that visual depiction was produced using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce. So there is ultimately that connection. But I think that the key case that illustrates how this circuit has dealt with this issue that is consistent with Lively is the Poulin case. P-O-U-L-I-N. And in that case, there were multiple devices. And even though there were multiple devices used and there wasn't really any direct tie between a specific visual depiction versus a specific device, it was an inference, a reasonable inference that could be made that the defendant did use those devices, did intend to use those devices to create those visual depictions. And that is consistent with how Lively treated the statute. And that's consistent with how we asked the court to apply 2251 in this case. If we apply that to this case, the evidence was simply that there was nothing to tie the actual iPhone 7 Plus that had not yet been manufactured yet at the time of the defendant's actions. Just so I understand, suppose the iPhone 7 had been manufactured. He just didn't own it. Is it a different outcome? It potentially is a different outcome. Well, not potentially. I mean, is your position it's a different outcome? And if so, why? I'm just trying to figure out what inferences you're saying are reasonable and, therefore, under Jackson, for sufficiency purposes, we say a rational juror could come to and which ones you're saying are unreasonable. Sure. If there were evidence that the defendant had been phone shopping, that there was evidence that he was considering purchasing this phone,  Why? Because there There was no evidence that he was considering copying onto it this image. So I think that it, again, it depends on what the evidence was. Here there was no evidence that there was any other device at the time that he was using or abusing the line. And for that reason, I think that Section 2251 should be applied as the Sixth Circuit has applied it. Counsel, can I ask you an argument, ask you a question about the sentencing issue? Yes. I gather you agree that plain error applies. Is that correct? I do. Okay. So given the nature of the conduct, given the way in which the judge described that conduct, how can you argue that even if there was an error in the calculation of the sentencing guidelines, how can you argue that that would have any effect on the judge's sentencing determination? I mean, you do have to establish that it would have that kind of effect in order to meet the third prong of plain error. What would permit you to make that argument given what the court very explicitly said in imposing the sentence? I think that it is some of the judge's own words in the reliance on the guideline calculation in comparison with that other defendant's to establish the sentence in this case. Because the judge used the guideline as that specific point of comparison with Dear Dio, I believe it was the other case, using that as comparison, using that as a starting off point, if the guideline calculation results in a lower number, then certainly there's a more than fair argument that the actual sentence should be lower. And so that's why that satisfies that prejudice component that Mr. Monson would have received a lower sentence if the calculation had been done correctly. I hope that answers your question. Maybe not to your satisfaction. Right. So I note that my time is low. I mentioned briefly concerning the motion to suppress argument concerning the custody. The cases do come out on all sides. I think the cases that I would point out most closely would be, obviously, Middle Kerry. I believe that we are closer to that than to some of the cases in opposition. What's your understanding of the finding as to what the interchange was between the officers and your client at the time of him leaving the house with them? In other words, what does he say? What do they say? What do you understand the district court found with respect to what led him to go with the officers to the station? The district court characterized that as him voluntarily choosing to go with the officers. So isn't that a factual finding we'd have to reverse for being clearly erroneous? I think that's the characterization, perhaps not. But I do agree that the choice for him to go with the officers is something that we would need to review for, or to be clearly erroneous otherwise. That I do agree. But I don't think that that changes the answer ultimately. I mean, that's because of what happens at the station house itself then? It's a combination of everything, right? Because the point is that, yes, he chose to enter into the vehicle, into the van, to agree to be transported to this other setting. But once you get to that setting, then things are a little different, right? He's no longer in a position where he can stay. That's what I'm saying. So are you saying that the custodial portion begins when he's in the station house and up until then it was voluntary? Or are you saying that somehow what happened at the house is relevant? And if so, why, if he chose to go with them of his own free will? So, yes, the answer is that everything that happens before being transported to the public safety complex is relevant because that's still information that he has at that time. Thanks. Thank you, Your Honors. Thank you. At this time, would Attorney Quinlivan please introduce himself on the record to begin? Good morning. Chief Judge Barron, and may it please the Court, Mark Quinlivan on behalf of the United States. If I could take these issues in reverse order of how they were presented. On the suppression, I think one of the key points is that the district court found that Special Agent Smyth's testimony at the suppression hearing was credible and believable. And what he testified with respect to the initial encounter was that eight or nine officers approached the defendant's residence. I think it was four or five went to the front door. When they encountered Mr. Monson, Agent Smyth asked him to talk with him, explained why they were there, told him he was not under arrest, that he was not under custody, and said they had some questions for him. And because there would be a search ongoing, it would be better to go back to the Granby Public Safety Complex. Counsel, the district court notes that the officers never told the defendant that he was free to leave. That strikes me as a pretty significant omission. I mean, in all candor, there seems to be a bit of a disconnect between how forgiving we are on this custodial issue and what a reasonable person might think under these circumstances. I mean, all these officers arrive. The suggestion is we should go to another facility where we can talk. They go to another facility. There are two officers there. Obviously, he's in big trouble. And absent an explicit statement, oh, yeah, you can go if you want, I mean, why wouldn't a reasonable person think under all of these circumstances, I can't just get up and walk out of here? I mean, there's something sort of non-commonsensical about that view of the law. I don't think that's how a reasonable person would understand the situation. I respectfully disagree, and the district court found to the contrary based on the totality of the circumstances, and I think that the court's reasoning was sound. You know, I'd point out that it wasn't just at the residence where the defendant was told that he was not under arrest, he was not in custody. When they got to the Granby Public Safety Complex, that was repeated. The defendant was never Pat Frisks, and the district court thought that that was actually a very important consideration. He wasn't put in handcuffs. None of the officers at any time deployed their weapons. And even when they got, well, let me take a step back. The district court did find that the defendant voluntarily agreed to go to the public safety complex, and even when you look at the means of transportation, he was in, yes, he was in an FBI van, but it was an FBI van that had not been modified for law enforcement purposes outside of emergency lights, meaning that it was a minivan. The defendant was, you know, came in through the sliding door. There wasn't any kind of cage or separation between the front seat and the back seat or locking mechanism. When they get to the public safety complex, they go to an open conference room off the public lobby, which is actually next door to the fire department. The police department, the testimony was across the hall, and there was actually a picture. It's Exhibit 9 of the suppression hearing and Exhibit 32 at trial of that doorway, and I think it's significant because there's big block lettering, fire department, in front of the fire department door, and then a plaque to the side saying fire department, and nothing above the conference room. So don't they tell him when we're done, we'll drive you back, but the suggestion is that until we're done, we're going to continue with this interrogation. Doesn't that statement suggest that he really can't go until they decide that we're done? I don't think so. I think that it suggests that even though he was going in an FBI van, that didn't mean, you know, I think it could be taken as just simply that, you know, you'll have a means of transportation when you come back. And I do think, Judge Lopez, it's important to point out as well that, you know, the district court listened to the entire interview. There were actually two different time frames and found that the agent, Special Agent Smyth, was conversational and not adversarial at any time, that the defendant appeared, you know, coherent, not under the influence, and that there was nothing in the questioning itself that suggested that this was custodial in any nature. The testimony, again, was that this was an open, that the door to the conference room was left open. The officers didn't bookend the defendant. They actually, he sat in one seat and the two officers sort of on opposite ends, and the defendant was actually closest to the door. And although there were a number of officers and agents who arrived at the scene, initially, it was only Special Agents, the agents Smyth and Sheehan, who were present during the questioning. And in considering the number of agents, this court has looked to the number of agents who were present during the questioning. Given what the record shows about the Miranda warning, what do you understand the significance to be in a way that matters for the outcome of the case of this determination about whether he was in custody? So my understanding is that if this court finds that the district court did not err in concluding I guess I'm really asking the opposite way. If we found the government, the district court did err, so he was in custody, what then follows in light of what the record shows about the Miranda warning? Well, then you would get to the question of whether the defendant voluntarily exercised, you know, consented to Miranda. And we don't have a finding on that? Is that the problem? That's correct. So the outcome at that point would be to vacate would be the idea? What happens at that point in the government's view? From our perspective, I think it's two ways. I think there's enough on the record where this court could look at that, but I think my understanding is in most instances, given that the district court did not make a finding as to that, the resolution would be a vacate and remand. The district court was very troubled by the statement of Officer Smyth, I think, to the fact that if you sign this document indicating that you've been given the Miranda warnings and you waive your right, the rights that are set forth in the Miranda warning, you're not giving anything up. I mean, that is on its face nonsense. You're giving up a great deal, and the district court judge was very critical of that. Wouldn't that provide a basis for us concluding that if this was not custodial, this was not a knowing involuntary waiver in light of that serious misrepresentation by the officer about the significance of signing the waiver form? Two answers, Judge Lopez. First off, I don't think it goes to whether it was a custodial interrogation. No, no, I understand that. Right. No, obviously that's something that the court could take into account. I would point out that the agent was asked what was he trying to convey, and what he said was, I was just simply trying to make the point that by signing this, you're agreeing to talk to us without a lawyer, but you're not giving those rights up altogether, and if at any time, you know, the defendant has said, how could this possibly be considered a knowing waiver, a knowing waiver when you have that unmistakable misrepresentation by the officer about the significance of signing that? I mean, I don't know how that could ever be considered a knowing waiver. Well, I think, you know, at most we're talking about, I can't remember the total, but we're talking, I think it's just one sentence that he says, and you have to take that in conjunction with everything else that occurred, including the fact. Is the point that's being discussed in this colloquy a point of fact or a point of law? Because I think that would be relevant to whether we would remand, assuming we found it was custodial. I think it's both, Your Honor. What's the factual component of it that we would need to get a finding from the district court on, that we would not review de novo? Well, on this very point, for example, the district court said that, you know, as an aside in terms of its custodial analysis, it thought that agents should refrain from making statements like this because the better course. But I'm saying if we remanded, the reason to remand would be because there's some factual finding to which we'd have to defer that the district court could make that would bear on whether it was a knowing waiver of the Miranda right, right? Right. So what is that factual finding that we'd be remanding for the district court to make, as opposed to it being just a legal finding, which we can just make ourselves as easily as the district court could on this record, if we're just reviewing de novo for whether it was knowing or not? I agree. And I guess my answer would be that the district court, in the context of its custodial analysis, made a number of very detailed findings, whether or not about, you know, for example, the defendant's, you know, demeanor during the questioning, you know, the fact that he was voluntarily answering questions, which of course is different from the question of whether it was a voluntary exercise of the Miranda. Counsel, there's no factual uncertainty about what was said. This is all a matter of an audio recording. We know what the officer said, but perhaps your view might be that just as the custodial determination is a kind of totality of the circumstances, that's true for knowingness too, right? You have to look at not just that particular exchange, but what went on more generally in that exchange. And we don't have the benefit of that, right? That's correct. But we don't give deference to that, do we? To, I'm sorry? To that totality. I thought that's the de novo thing. That's what we reviewed de novo. No, that's right, Chief Judge Barron. But I think my understanding is that, again, when you're talking about the totality, there may have been important points that the district court may not have found necessarily significant in terms of the custodial analysis, or may have thought more significant in the custodial analysis vis-a-vis the voluntariness analysis, i.e., the district court was emphasizing the key points as it understood the framework when you're looking at whether it's a custodial interrogation. There may be additional facts in the context of everything that occurred that the district court might find more significant or less significant in turning to that separate inquiry. Do you want to address the count one issue? Yes. I think, in answer to several of the questions, I do think that the defendant's position is not only flatly inconsistent with the Seventh Circuit's decision in Foley, but it's also inconsistent, in our view, with this court's precedence. And I do want to point out why, in the Pooleen case, that's so. Because, in that case, the defendant argued that production occurs only at the moment when an image is captured. And, with respect to the jurisdictional element, argued that the government had failed to tie any particular recording device to an image, a recording device that had traveled in interstate commas to any particular image. And this court rejected the broader claim as inconsistent with the capacious definition of producing that Congress employed in Section 2256. But on the more specific claim about the jurisdictional element, this court noted the argument that it had to have been a recording device that had traveled in interstate commas tied to an image. And this court disagreed and said that all of the media equipment and materials in the case, which included the DVDs on which the images were stored. That's some misunderstanding, though. I think if I heard your opponent today, he could concede everything you're saying, but I heard him to be saying what's missing here is any evidence that, at the time, the initial depiction was created, at the time the child was used to make a depiction. There is no evidence that, at that time, the defendant was doing so for the purpose of making the copy that is the copy that's on a device that was produced through interstate commas. So what's your answer to that? I have two answers to you, Judge Barron. First off, I haven't seen, and whether it's in Poulin, whether it's in Foley, whether it's in Berdoulas, whether it's in Patti, I haven't seen anything where that particular analysis has somehow changed the outcome. Well, one thing that's a bit of a concern is I haven't seen any case that engages with that analysis, really. I mean, the closest is Lively, but Lively, I can see how you say it's potentially read in a way that can't be consonant with the statute. But even if we accept your reason for rejecting Lively's analysis, that still leaves the question of, in order for there to be sufficient evidence, there's got to be some basis in the record for concluding that in taking the initial, making the initial production of the depiction, it was contemplated at that time that the copy that's count one was in the mind of the defendant, not in the specifics, but that you could infer if he made that one, he was going to make another. And obviously, at some point, it would be too attenuated. I mean, you wouldn't infer from making a copy on a cell phone that didn't travel interstate commerce that he was going to mass produce the thing for commercial purposes or something like that, right? Right. Okay, so what's the chain of inference in the record here that would support it? Foley comes out in favor of your position, but as I read Foley, it doesn't have analysis of this particular question. Agreed, and if briefly answered, I think a jury could infer, particularly in the electronic age, that when somebody has a cell phone, regardless of what kind of cell phone that is, that it is anticipated at some point, whether it becomes obsolete, whether the person wants to trade it in to a different device, that that person, that that cell phone will, that the defendant will get a next generation cell phone and also understand that everything on the initial cell phone gets, and I'm not sure, again, the correct word, whether it's transferred, transmitted, whether it's through the cloud, that it then gets, as there was testimony at the trial, populated on the new cell phone. There was testimony to that fact? Well, it was the Special Agent Smythe testified that the defendant had said that he had traded in his iPhone 6 for the iPhone 7 Plus and that the image in question for Cam 1 was populated on the iPhone 7 Plus. But there was no evidence about generally what people do or that type of thing, no? No, no, there was nothing of that sort, Your Honor. Thank you. Thank you. At this time, would Attorney King please introduce himself again and begin his one-minute rebuttal? Thank you. Jinho King for Mr. Monson. I just want to emphasize the point that, Judge Barron, you were just making, that there needs to be some evidence that there was intent. And perhaps that evidence could have come in the form of what people generally do with phones when they get new phones, what Mr. Monson specifically did, not just with the single image but as a general practice, to try to get at that intent because the focus needs to be on his intent at the time of the use of the minor. So there was evidence that there were additional depictions on the iPhone 7 several months later. It may not have been pitched that way, but you're saying that could not qualify? I don't think that it qualifies in this situation. There was evidence that that image populated over. Is that enough? And that there were several other images created on the iPhone 7. Yes. So this is one of a group. If I may answer, the other images that were created on the iPhone 7 is a different issue than the intent at the time that he created images on the iPhone 6. And I just want to make sure that that distinction is clear, that the argument for Count 1 is that that was created on a different device. I understand the argument, yes. On the sentencing question, actually on the Count 1 question, if you should prevail on Count 1 and you don't prevail on any of your other arguments, does there have to be a remand for resentencing given that that was a concurrent sentence or can we correct it ourselves or is it just a technical remand? We believe that it needs to go back for resentencing. And because if what the argument was, sorry, if the reasoning behind the district court's sentencing should be accepted, then the guideline calculation is no longer the same because they calculated the guideline sentence based on the statutory maxima, which is different if there is one less count that's convicted. Thank you very much. Thank you. This concludes arguments in this case.